Justice Breyer,
concurring.
This case raises a question that I believe neither the plurality nor the dissent answers adequately: How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians? In this context, what, if any, are the outer limits of the “testimonial statements” rule set forth in Crawford v. Washington, 541 U. S. 36 (2004)? Because I believe the question difficult, important, and not squarely addressed either today or in our earlier opinions, and because I believe additional briefing would help us find a proper, generally applicable answer, I would set this case for reargument. In the absence of doing so, I adhere to the dissenting views set forth in Melendez-Diaz v. Massachusetts, 557 U. S. 305 (2009), and Bullcoming *87 v. New Mexico, 564 U. S. 647 (2011). I also join the plurality’s opinion.
[[Image here]]
[[Image here]]
This case is another in our series involving the intersection of the Confrontation Clause and expert testimony. Before trial, the prosecution’s expert, Sandra Lambatos, received a copy of a report prepared by Cellmark Diagnostics Laboratory. That report reflected the fact that Cellmark technicians had received material from vaginal swabs taken from the crime victim, had identified semen in that material, and had derived a profile of the male DNA that the semen contained. Lambatos then entered that profile into an Illinois State Police Crime Laboratory computerized database, which contained, among many other DNA profiles, a profile derived by the crime laboratory from Williams’ blood (taken at an earlier time). The computer she was using showed that the two profiles matched. Lambatos then confirmed the match.
Later, Lambatos testified at trial, where the prosecutor asked her three relevant questions. First, the prosecutor asked whether there was “a computer match generated of the male DNA profile [derived by Cellmark] found in [the] semen from the vaginal swabs ... to [the] male DNA profile [found in the database] that had been identified as having originated from Sandy Williams.” App. 56. Since the computer had shown such a match, Lambatos answered affirmatively. Ibid.
Second, the prosecutor asked whether Lambatos had independently “compare[d the DNA profile that Cellmark had derived from] the semen that had been identified . . . from the vaginal swabs of [the victim] to the male DNA profile [found in the database] that had been [derived] ... from the blood of Sandy Williams.” Ibid. Lambatos again answered affirmatively. Ibid.
*88 Third, the prosecutor asked whether, in Lambatos’ expert opinion, the DNA profile derived from the semen identified in the vaginal swabs of the victim was “a match to Sandy Williams.” Id., at 58. Lambatos again answered affirmatively. Ibid.
The Confrontation Clause problem lies in the fact that Lambatos did not have personal knowledge that the male DNA profile that Cellmark said was derived from the crime victim’s vaginal swab sample was in fact correctly derived from that sample. And no Cellmark expert testified that it was true. Rather, she simply relied for her knowledge of the fact upon Cellmark’s report. And the defendant Williams had no opportunity to cross-examine the individual or individuals who produced that report.
In its first conclusion, the plurality explains why it finds that admission of Lambatos’ testimony nonetheless did not violate the Confrontation Clause. That Clause concerns out-of-court statements admitted for their truth. Ante, at 70. Lambatos’ testimony did not introduce the Cellmark report (which other circumstantial evidence supported) for its truth. Ante, at 70-75. Rather, Lambatos used the Cell-mark report only to indicate the underlying factual information upon which she based her independent expert opinion. Ibid. Under well-established principles of evidence, experts may rely on otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely upon. See Fed. Rule Evid. 703; Ill. Rule Evid. 703. Nor need the prosecution enter those out-of-court statements into evidence for then-truth. That, the Illinois courts held, is just what took place here. Ante, at 64.
The dissent would abandon this well-established rule. It would not permit Lambatos to offer an expert opinion in reliance on the Cellmark report unless the prosecution also produces one or more experts who wrote or otherwise produced the report. I am willing to accept the dissent’s characteriza *89 tion of the present rule as artificial, see post, at 132-133 (opinion of Kagan, J.), but I am not certain that the dissent has produced a workable alternative, see Bullcoming, supra, at 679-680 (Kennedy, J., dissenting) (expressing similar view).
Once one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so. Experts— especially laboratory experts—regularly rely on the technical statements and results of other experts to form their own opinions. The reality of the matter is that the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another. Hence my general question: How does the Confrontation Clause apply to crime laboratory reports and underlying technical statements made by laboratory technicians?
B
The general question is not easy to answer. The California case described at the outset of the dissenting opinion helps to illustrate the difficulty. In that example, Cellmark, the very laboratory involved in this case, tested a DNA sample taken from the crime scene. A laboratory analyst, relying upon a report the laboratory had prepared, initially stated (at a pretrial hearing about admissibility) that the laboratory had found that the crime-scene DNA sample matched a sample of the defendant’s DNA. But during the hearing and after reviewing the laboratory’s notes, the laboratory analyst realized that the written report was mistaken. In fact, the testing showed only that the crime-scene DNA matched a sample of the victim’s DNA, not the defendant’s DNA. At some point during the writing of the report, someone, perhaps the testifying analyst herself, must have misread the proper original sample labeling. Upon discovering the error, the analyst corrected her testimony.
*90 The example is useful, not simply because as adapted it might show the importance of cross-examination (an importance no one doubts), but also because it can reveal the nature of the more general question before us. When the laboratory in the example received the DNA samples, it labeled them properly. The laboratory’s final report mixed up the labels. Any one of many different technicians could be responsible for an error like that. And the testifying analyst might not have reviewed the underlying notes and caught the error during direct examination (or for that matter, during cross-examination).
Adapting the example slightly, assume that the admissibility of the initial laboratory report into trial had been directly at issue. Who should the prosecution have had to call to testify? Only the analyst who signed the report noting the match? What if the analyst who made the match knew nothing about either the laboratory’s underlying procedures or the specific tests run in the particular case? Should the prosecution then have had to call all potentially involved laboratory technicians to testify? Six to twelve or more technicians could have been involved. (See Appendix, infra, which lists typically relevant laboratory procedures.) Some or all of the words spoken or written by each technician out of court might well have constituted relevant statements offered for their truth and reasonably relied on by a supervisor or analyst writing the laboratory report. Indeed, petitioner’s amici argue that the technicians at each stage of the process should be subject to cross-examination. See Brief for Innocence Network as Amicus Curiae 13-23 (hereinafter Innocence Network Brief).
And as is true of many hearsay statements that fall within any of the 20 or more hearsay exceptions, cross-examination could sometimes significantly help to elicit the truth. See Fed. Rule Evid. 803 (listing 24 hearsay exceptions). The Confrontation Clause as interpreted in Crawford recognizes, as a limitation upon a pure “testimonial statement” require *91 ment, circumstances where the defendant had an adequate “prior opportunity to cross-examine.” 541 U. S., at 59. To what extent might the “testimonial statements” requirement embody one or more (or modified versions) of these traditional hearsay exceptions as well?
Lower courts and treatise writers have recognized the problem. And they have come up with a variety of solutions. The New Wigmore, for example, lists several nonexclusive approaches to when testifying experts may rely on testing results or reports by nontestifying experts (i. e., DNA technicians or analysts), including: (1) “the dominant approach,” which is simply to determine the need to testify by looking at “the quality of the nontestifying expert’s report, the testifying expert’s involvement in the process, and the consequent ability of the testifying expert to use independent judgment and interpretive skill”; (2) permitting “a substitute expert to testify about forensic science results only when the first expert is unavailable” (irrespective of the lack of opportunity to cross-examine the first expert, cf. Crawford, supra, at 59); (3) permitting “a substitute expert” to testify if “the original test was documented in a thorough way that permits the substitute expert to evaluate, assess, and interpret it”; (4) permitting a DNA analyst to introduce DNA test results at trial without having “personally perform[ed] every specific aspect of each DNA test in question, provided the analyst was present during the critical stages of the test, is familiar with the process and the laboratory protocol involved, reviews the results in proximity to the test, and either initials or signs the final report outlining the results”; (5) permitting the introduction of a crime laboratory DNA report without the testimony of a technician where the “testing in its preliminary stages” only “requires the technician simply to perform largely mechanical or ministerial tasks . . . absent some reason to believe there was error or falsification”; and (6) permitting introduction of the report without requiring the technicians to testify where *92 there is a showing of “genuine unavailability.” See D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence, §§ 4.10.2, 4.10.3, pp. 202, 204, 206 (2d ed. 2011) (internal quotation marks and footnote omitted); id., § 4.11.6, at 24 (Supp. 2012).
Some of these approaches seem more readily compatible with Crawford than others. Some seem more easily considered by a rules committee (or by state courts) than by this Court. Nonetheless, all assume some kind of Crawford boundary—some kind of limitation upon the scope of its application—though they reflect different views as to just how and when that might be done.
Answering the underlying general question just discussed, and doing so soon, is important. Trial judges in both federal and state courts apply and interpret hearsay rules as part of their daily trial work. The trial of criminal cases makes up a large portion of that work. And laboratory reports frequently constitute a portion of the evidence in ordinary criminal trials. Obviously, judges, prosecutors, and defense lawyers have to know, in as definitive a form as possible, what the Constitution requires so that they can try their cases accordingly.
The several different opinions filed today embody several serious, but different, approaches to the difficult general question. Yet none fully deals with the underlying question as to how, after Crawford, Confrontation Clause “testimonial statement” requirements apply to crime laboratory reports. Nor can I find a general answer in Melendez-Diaz or Bull-coming. While, as a matter of pure logic, one might use those cases to answer a narrowed version of the question presented here, see post, at 124-125 (Kagan, J., dissenting), those cases do not folly consider the broader evidentiary problem presented. I consequently find the dissent’s response, “Been there, done that,” unsatisfactory. Post, at 137.
Under these circumstances, I would have this case rear-gued. I would request the parties and amici to focus spe *93 cifically upon the broader “limits” question. And I would permit them to discuss, not only the possible implications of our earlier post -Crawford opinions, but also any necessary modifications of statements made in the opinions of those earlier cases.
HH ⅜—I
In the absence of reargument, I adhere to the dissenting view set forth in Melendez-Diaz and Bullcoming, under which the Cellmark report would not be considered “testimonial” and barred by the Confrontation Clause. See also ante, at 81-86 (setting forth similar conclusion). That view understands the Confrontation Clause as interpreted in Crawford to bar the admission of “[t] estimonial” statements made out of court unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine. 541 U. S., at 59 (emphasis added). It also understands the word “testimonial” as having outer limits and Crawford as describing a constitutional heartland. And that view would leave the States with constitutional leeway to maintain traditional expert testimony rules as well as hearsay exceptions where there are strong reasons for doing so and Crawford’s, basic rationale does not apply.
In particular, the States could create an exception that presumptively would allow introduction of DNA reports from accredited crime laboratories. The defendant would remain free to call laboratory technicians as witnesses. Were there significant reason to question a laboratory’s technical competence or its neutrality, the presumptive exception would disappear, thereby requiring the prosecution to produce any relevant technical witnesses. Such an exception would lie outside Crawford’s, constitutional limits.
Consider the report before us. Cellmark’s DNA report embodies technical or professional data, observations, and judgments; the employees who contributed to the report’s findings were professional analysts working on technical matters at a certified laboratory; and the employees operated *94 behind a veil of ignorance that likely prevented them from knowing the identity of the defendant in this case. Statements of this kind fall within a hearsay exception that has constituted an important part of the law of evidence for decades. See Fed. Rule Evid. 803(6) (“Records of A Regularly Conducted Activity”); 2 J. Wigmore, Evidence §§ 1517-1533, pp. 1878-1899 (1904) (“Regular Entries”). And for somewhat similar reasons, I believe that such statements also presumptively fall outside the category of “testimonial” statements that the Confrontation Clause makes inadmissible.
As the plurality points out, ante, at 81-86, the introduction of statements of this kind does not risk creating the “principal evil at which the Confrontation Clause was directed.” Crawford, 541 U. S., at 50. That evil consists of the pre-Constitution practice of using “ex parte examinations as evidence against the accused.” Ibid. Sir Walter Raleigh’s case illustrates the point. State authorities questioned Lord Cobham, the key witness against Raleigh, outside his presence. They then used those testimonial statements in court against Raleigh. And when Raleigh asked to face and to challenge his accuser, he was denied that opportunity. See id., at 44.
The Confrontation Clause prohibits the use of this kind of evidence because allowing it would deprive a defendant of the ability to cross-examine the witness. Id., at 61-62; Mattox v. United States, 156 U. S. 237, 242-243 (1895). That deprivation would prevent a defendant from confronting the witness. And it would thereby prevent a defendant from probing the witness’ perception, memory, narration, and sincerity. See, e. g., 2 K. Broun et al., McCormick on Evidence § 245, p. 125 (6th ed. 2006); E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 119-127 (1956); 30 C. Wright & K. Graham, Federal Practice and Procedure § 6324, pp. 44-49 (1997); see also M. Hale, History of the Common Law of England 258 (1713) (explaining virtues of confronting witness); 3 W. Blackstone, Commentaries *95 on the Laws of England 373 (1768) (same). But the need for cross-examination is considerably diminished when the out-of-court statement was made by an accredited laboratory employee operating at a remove from the investigation in the ordinary course of professional work.
For one thing, as the hearsay exception itself reflects, alternative features of such situations help to guarantee its accuracy. An accredited laboratory must satisfy well-established professional guidelines that seek to ensure the scientific reliability of the laboratory’s results. App. 59-60, 74, 86-87; see Brief for National District Attorneys Association et al. as Amici Curiae 25, n. 5 (hereinafter NDAA Brief) (noting that the standards date back 30 years); Giannelli, Regulating Crime Laboratories: The Impact of DNA Evidence, 15 J. L. & Pol’y 59, 72-76 (2007). For example, forensic DNA testing laboratories permitted to access the FBI’s Combined DNA Index System must adhere to standards governing, among other things, the organization and management of the laboratory; education, training, and experience requirements for laboratory personnel; the laboratory’s physical facilities and security measures; control of physical evidence; validation of testing methodologies; procedures for analyzing samples, including the reagents and controls that are used in the testing process; equipment calibration and maintenance; documentation of the process used to test each sample handled by the laboratory; technical and administrative review of every case file; proficiency testing of laboratory personnel; corrective action that addresses any discrepancies in proficiency tests and casework analysis; internal and external audits of the laboratory; environmental health and safety; and outsourcing of testing to vendor laboratories. See Brief for New York County District Attorney’s Office et al. as Amici Curiae 4, n. 4 (hereinafter NY County DAO Brief); see also App. to NY County DAO Brief A22-A49.
These standards are not foolproof. Nor are they always properly applied. It is not difficult to find instances in *96 which laboratory procedures have been abused. See, e. g., Innocence Network Brief 6-11; App. to Brief for Public Defender Service for the District of Columbia et al. as Amici Curiae 1a-12a; cf. Giannelli, The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories, 4 Va. J. Soc. Pol’y & L. 439 (1997). Moreover, DNA testing itself has exonerated some defendants who previously had been convicted in part upon the basis of testimony by laboratory experts. See Melendez-Diaz, 557 U. S., at 319 (citing Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1 (2009)).
But if accreditation did not prevent admission of faulty evidence in some of those cases, neither did cross-examination. In the wrongful-conviction cases to which this Court has previously referred, the forensic experts all testified in court and were available for cross-examination. Sklansky, Hearsay’s Last Hurrah, 2009 S. Ct. Rev. 1, 72-73 (cited study “did not identify any cases in which hearsay from forensic analysts contributed to the conviction of innocent defendants”); see Garrett & Neufeld, supra, at 10-12, 84, 89 (noting that cross-examination was rarely effective); see also Murphy, The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence, 95 Cal. L. Rev. 721, 785-786 (2007) (suggesting need for greater reliance upon accreditation and oversight of accredited laboratories); Sklansky, supra, at 74 (same). Similarly, the role of cross-examination is ambiguous in the laboratory example that the dissent describes. See post, at 118-119. (Apparently, the report’s error came to light and was corrected after cross-examination had concluded, see Thompson, Taroni, & Aitken, Author’s Response, 48 J. For. Sci. 1202 (2003), and in any event all parties had received the correctly labeled underlying laboratory data, see Clarke, Commentary, id., at 1201.)
*97 For another thing, the fact that the laboratory testing takes place behind a veil of ignorance makes it unlikely that a particular researcher has a defendant-related motive to behave dishonestly, say, to misrepresent a step in an analysis or otherwise to misreport testing results. Cf. Michigan v. Bryant, 562 U. S. 344, 361 (2011) (discussing the “prospect of fabrication” as a factor in whether the Confrontation Clause requires statements “to be subject to the crucible of cross-examination”). The laboratory here, for example, did not know whether its test results might help to incriminate a particular defendant. Ante, at 84-86; cf. Melendez-Diaz, supra, at 310-311; Bullcoming, 564 U. S., at 664.
Further, the statements at issue, like those of many laboratory analysts, do not easily fit within the linguistic scope of the term “testimonial statement” as we have used that term in our earlier cases. As the plurality notes, in every post -Crawford case in which the Court has found a Confrontation Clause violation, the statement at issue had the primary purpose of accusing a targeted individual. Ante, at 82-84; see, e. g., Davis v. Washington, 547 U. S. 813, 822 (2006) (“primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution”); Bryant, supra, at 358 (“primary purpose of creating an out-of-court substitute for trial testimony”). The declarant was essentially an adverse witness making an accusatory, testimonial statement—implicating the core concerns of the Lord Cobham-type affidavits. But here the DNA report sought, not to accuse petitioner, but instead to generate objectively a profile of a then-unknown suspect’s DNA from the semen he left in committing the crime. See ante, at 84-86.
Finally, to bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of fact-finding at a criminal trial. Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports. Autopsies, like the DNA re *98 port in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim’s body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? E. g., State v. Lackey, 280 Kan. 190, 195-196, 120 P. 3d 332, 341 (2005); see also People v. Geier, 41 Cal. 4th 555, 601-602, 161 P. 3d 104, 136-137 (2007). Is the Confrontation Clause “‘effectively’” to function “‘as a statute of limitations for murder’”? Melendez-Diaz, supra, at 335 (Kennedy, J., dissenting) (quoting Comment, Toward a Definition of “Testimonial”: How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Cal. L. Rev. 1093, 1115 (2008)).
In general, such a holding could also increase the risk of convicting the innocent. The New York County District Attorney’s Office and the New York City Office of the Chief Medical Examiner tell us that the additional cost and complexity involved in requiring live testimony from perhaps dozens of ordinary laboratory technicians who participate in the preparation of a DNA profile may well force a laboratory “to reduce the amount of DNA testing it conducts, and force prosecutors to forgo forensic DNA analysis in cases where it might be highly probative. In the absence of DNA testing, defendants might well be prosecuted solely on the basis of eyewitness testimony, the reliability of which is often questioned.” NY County DAO Brief 10 (citing United States v. Wade, 388 U. S. 218, 229 (1967)); see also NDAA Brief 26 (such a holding “will also impact the innocent who may wait to be cleared from suspicion or exonerated from mistaken conviction”). I find this plausible. But cf. Innocence Network Brief 3. An interpretation of the Clause that risks greater prosecution reliance upon less reliable evidence cannot be sound. Cf. Maryland v. Craig, 497 U. S. 836, 845 *99 (1990) (“The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant”).
Consequently, I would consider reports such as the DNA report before us presumptively to lie outside the perimeter of the Clause as established by the Court’s precedents. Such a holding leaves the defendant free to call the laboratory employee as a witness if the employee is available. Moreover, should the defendant provide good reason to doubt the laboratory’s competence or the validity of its accreditation, then the alternative safeguard of reliability would no longer exist and the Constitution would entitle the defendant to Confrontation Clause protection. Similarly, should the defendant demonstrate the existence of a motive to falsify, then the alternative safeguard of honesty would no longer exist and the Constitution would entitle the defendant to Confrontation Clause protection. Cf. 2 Wigmore, Evidence § 1527, at 1892 (in respect to the business records exception, “there must have been no motive to misrepresent”). Thus, the defendant would remain free to show the absence or inadequacy of the alternative reliability/honesty safeguards, thereby rebutting the presumption and making the Confrontation Clause applicable. No one has suggested any such problem in respect to the Cellmark report at issue here.
Because the plurality’s opinion is basically consistent with the views set forth here, I join that opinion in full.
APPENDIX
This appendix outlines the way that a typical modern forensic laboratory conducts DNA analysis. See NY County DAO Brief 7-8; NDAA Brief 22-23; Innocence Network Brief 13-23; see also Dept. of Justice, Office of the Inspector General, The FBI DNA Laboratory: A Review of Protocol and Practice Vulnerabilities 6-14 (May 2004), online at http:// www.justice.gov/oig/special/0405/final.pdf (as visited June 14, *100 2012, and available in Clerk of Court’s case file). The DNA analysis takes place in three parts, through three different sets of laboratory experts: (1) A DNA profile is derived from the suspect’s DNA sample, (2) a DNA profile is derived from the crime-scene DNA sample, and (3) an analyst compares the two profiles and makes a conclusion.
As many as six technicians may be involved in deriving the profile from the suspect’s sample; as many as six more technicians may be involved in deriving the profile from the crime-scene sample; and an additional expert may then be required for the comparative analysis, for a total of about a dozen different laboratory experts. Each expert may make technical statements (express or implied) during the DNA analysis process that are in turn relied upon by other experts. The amici dispute how many of these experts the Confrontation Clause requires to be subject to cross-examination. Compare Innocence Network Brief 13-23 with NY County DAO Brief 7-8 and NDAA Brief 22-23. In charting the three-step process, the appendix first summarizes the laboratory procedures used to derive a DNA profile and then illustrates potential statements that technicians may make to explain their analysis.

*101
A. Profile of Suspect’s Sample (Summary of Lab Process)

[[Image here]]

*102
B. Profile of Crime-Scene Sample (Examples of Statements)

[[Image here]]
*103 [[Image here]]
C. Comparison Between the Two DNA Profiles
[[Image here]]